***********
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Ledford. Based upon review of all of the competent evidence of record with reference to the errors assigned, and finding good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence affirms in part and reverses in part the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between plaintiff-employee and defendant-employer.
3. The employer was insured for workers' compensation coverage at all relevant times with Royal Sunalliance as the carrier.
4. The issues for determination before the Commission are:
 a. What are the compensable consequences of plaintiff's July 7, 2001, injury by accident?
 b. Whether plaintiff's current disability and medical condition is related to the injury of July 7, 2001?
5. The parties also stipulated the admissibility of seven exhibits, all of which were accepted and received into evidence. The stipulated exhibits are:
• Exhibit # 1 — Social Security Letter
• Exhibit # 2 — Plaintiff's Discovery Responses
• Exhibit # 3 — Defendants' Discovery Responses
 • Exhibit # 4 — Defendants' Responses to Second Set of Discovery
• Exhibit # 5 — Plaintiff's Personnel File
• Exhibit # 6 — Medical and Vocational Records
 • Exhibit # 7 — Form 18, Amended Form 18, Form 19, and Form 33R
 ***********
Based upon the competent evidence of record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, the plaintiff was 60 years old. She was a high school graduate who had attended Winthrop College for three years.
2. Prior to working for defendant-employer, plaintiff performed consulting work in interior design, worked as a seamstress and as a sales associate at both Sofa Connection and Rhodes Furniture. Most of plaintiff's work with past employers and with defendant-employer involved prolonged standing.
3. Plaintiff began working for defendant on or about February 13, 2001. She worked in retail as a gift associate for merchandising arrangements, floor sales, and cleaning the household goods department.
4. At the hearing before the Deputy Commissioner, the plaintiff testified that she has a pre-existing condition known as hammertoe on each foot and that she has had this condition since birth. Nevertheless, plaintiff testified that she had regularly worked in jobs requiring her to be on her feet all day.
5. Plaintiff testified that her job duties with defendant included extensive standing, lifting more than 25 pounds and stocking the floor with heavy merchandise and that on July 7, 2001, while working for defendant in the stock room, a box containing picture frames fell on her left foot. Plaintiff estimated that the box weighed about twenty (20) pounds. Plaintiff further testified that on the next day, July 8, 2001, she called her supervisor, Bob Rhoad to report that she could not report to work because she had hurt her foot. Plaintiff did not report to work for the next three days due to her injured left foot.
6. On July 14, 2001, plaintiff went to Mission St. Joseph's Hospital Emergency Room complaining of pain in her left foot for about a week. She reported that a box had fallen on her foot at work. Plaintiff had x-rays taken, which were normal, indicating no fracture or dislocation. Plaintiff was discharged to follow-up with Asheville Orthopedics.
7. On July 19, 2001, plaintiff presented to, Dr. Daniel Eglington, an orthopedist, who examined plaintiff for her foot pain. Dr. Eglington immediately placed plaintiff's foot in a boot cast. Dr. Eglington then referred plaintiff to Dr. William McKibbin, a foot specialist.
8. Plaintiff returned to work for defendant on July 19, 2001, and continued to wear her boot cast. She continued to work as best she could, missing several days in July and August due to her foot pain. Plaintiff testified that she believed she only worked for nine days between July 19, 2001, and August. In August, plaintiff discussed her problem of constantly being on her feet with her manager, Jane Wesley.
9. On August 9, 2001, plaintiff again presented to Dr. McKibbin, complaining of pain in and around her second toe on her left foot. Plaintiff reported to Dr. McKibbin that she injured her foot when a box fell on it at work. Dr. McKibbin diagnosed her with post-traumatic left second metatarsal phalangeal joint synovitis. He also assigned plaintiff some initial work restrictions which limited her bending, stooping and twisting and restricted her to no climbing stairs or ladders, no lifting greater than 25 pounds and required plaintiff to sit for 30 minutes for every one hour of work. Plaintiff returned to work for defendant.
10. Plaintiff encountered more difficulty performing her job. Due to the extreme pain in plaintiff's foot, her limping and her subsequent back problems, plaintiff notified Ms. Westley, a supervisor for defendant, on August 11, 2001, that she could no longer perform her job due to the pain in her foot.
11. At plaintiff's January 25, 2002 visit, Dr. McKibbin noted that her condition had improved and he anticipated she would soon be at maximum medical improvement. On April 8, 2002, Dr. McKibbin assessed plaintiff at maximum medical improvement with a 7% rating to her left lower extremity due to her injury by accident. Notwithstanding this rating and determination of maximum medical improvement, plaintiff testified that her pain continued to worsen and that she began to limp and to favor her right side.
12. Plaintiff testified that on February 11, 2003, she presented to Dr. McKibbin. X-rays taken at that time revealed dislocated second metatarsal joint and dislocated sesamoids in plaintiff's left foot. Dr. McKibbin again recommended surgical repair of plaintiff's foot deformities in July 2003 and continued her work restrictions of no standing more than 15 minutes at a time every hour. He further noted that plaintiff was having an associated limp, which caused her back and right side pain problems, which he related back to her original injury at work on July 7, 2001.
13. Plaintiff testified at the hearing before the Deputy Commissioner, that in October 1994, she had one prior back problem that occurred when she attempted to lift an ottoman at Rhodes Furniture. She did miss a few days of work but neither received any restrictions nor had back surgery. However, after injuring her foot while working for defendant, plaintiff testified that her back pain is devastating.
14. Dr. Jonathan J. Paul, orthopedic surgeon, conducted an independent review of plaintiff's medical records. Dr. Paul opined that any surgery would be necessary due to plaintiff's progressive pre-existing condition, and was not caused by a box falling on her foot.
15. On September 13, 1996, Dr. Mark Hedrick, orthopedic surgeon, examined the plaintiff only once and noted plaintiff's history indicated possible rheumatoid arthritis. Dr. Hedrick subsequently opined after the hearing of this matter before the Deputy Commissioner that a significant number of hammertoe conditions do require surgery. He opined, however, that it would be unlikely that a box falling on plaintiff's foot would aggravate or exacerbate plaintiff's hammertoe condition.
16. Dr. McKibbin opined that plaintiff's injury of July 7, 2001, did cause the increased problems in plaintiff's left foot. Dr. McKibbin opined that plaintiff's original injury set up problems with the ligamentous attachments to her second toe which is, in essence, the heart of her problem, and from that came inflammation, pain and swelling. Dr. McKibbin further stated that he thought the trauma basically became worse over time with respect to the bottom attachments of plaintiff's toe, which ultimately attenuated, and then finally allowed the toe to dislocate, causing the increased pain.
17. In his deposition testimony, Dr. McKibbin also opined that there is a temporal and medical relationship between plaintiff's July 7, 2001 trauma to her foot and the problems she later developed. Specifically, Dr. McKibbin opined that plaintiff's associated limp, which was related to her July 7, 2001, injury caused her later problems and that plaintiff's back and right side pain probably were significantly exacerbated, aggravated or contributed to by her left foot injury.
18. On February 6, 2004, Dr. McKinnin opined in his deposition testimony that plaintiff's excessive pain caused her to miss work for defendant in July and August 2001 because she was not able to stand excessively on her feet performing her job duties. He also opined that the July 7, 2001, injury at work caused plaintiff's increased problems to her left foot and that until plaintiff has had the recommended surgery, she is not and will not be at maximum medical improvement.
19. The Full Commission gives greater weight to the testimony and opinions of Dr. McKibbin, who is plaintiff's treating physician and the most active in her treatment and care over the opinions of Dr. Paul, who only reviewed plaintiff's medical records and Dr. Hedrick who only evaluated plaintiff once.
20. The Full Commission finds the plaintiff and her witnesses to be more credible than the defendant's witnesses.
21. The competent evidence establishes and the Full Commission finds that plaintiff's pre-existing left foot conditions were significantly aggravated by the traumatic injury by accident of July 7, 2001, and that her current foot, back and right side pain and problems are related to the July 7, 2001, event.
22. Dr. McKibbin opined that the plaintiff is capable of working in some capacity. At the hearing before the Deputy Commissioner, the plaintiff testified that after leaving the defendant's employment she secured employment as a telephone order taker at J. Crew but could only work for three days due to her pain. Plaintiff also applied to a beauty shop, for a receptionist position and to a "rug place," but was not hired.
23. Randy Adams, a vocational rehabilitation counselor and vocation evaluator, reviewed the plaintiff's medical records, visited with the plaintiff and administered tests to determine plaintiff's abilities. Mr. Adams then opined that the plaintiff is not capable of obtaining or maintaining any substantial gainful activity in the local state or national economy.
24. The Full Commission gives greater weight to Dr. McKibbin, plaintiff's treating physician, regarding whether, when and to what extent the plaintiff may return to work. However, Dr. McKibbin stated again that the plaintiff still has not had the surgery he has recommended and he maintains that until plaintiff has the surgery, she is not and will not be at maximum medical improvement.
25. The competent evidence in the record establishes that although the plaintiff may be capable of performing some work, she has not yet had the recommended surgery; she has been unsuccessful in obtaining employment and, consequently, is not at maximum medical improvement. The Full Commission finds that the 62-year-old plaintiff has made reasonable efforts to obtain work within her restrictions pending the recommended surgery, notwithstanding that she has been unsuccessful.
26. The Full Commission finds that the medical evidence establishes that plaintiff's July 7, 2001, accident aggravated her left foot, back and right side pain for which the plaintiff still has not had relief nor the recommended surgery to correct these problems. The surgery would give relief and lessen or cure plaintiff's disability and may allow plaintiff to secure employment. Plaintiff still has not had the surgery recommended by her treating physician and without such recommended surgery; the plaintiff continues to be disabled.
27. As of July 7, 2001, plaintiff's average weekly wage was $320.00, yielding a compensation rate of $213.34.
 ***********
Based upon the foregoing stipulations and findings of fact, the undersigned enters the following:
 CONCLUSIONS OF LAW
1. On or about July 7, 2001, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant, when a box dropped on her left foot. As a consequence of this injury by accident, plaintiff sustained an aggravation of her pre-existing left foot, back and right side pain. N.C. Gen. Stat. §§ 97-2(6); 97-2(19), 97-25.
2. As a result of the plaintiff's compensable injuries by accident, the plaintiff is entitled to temporary total disability compensation at a rate of $213.34 beginning August 12, 2001, and continuing, except for the dates plaintiff worked for J. Crew, and continuing until further Order of the Commission. Counsel shall review the defendant's company records to determine whether plaintiff is owed any additional disability compensation for the time periods plaintiff was out of work due to her injury by accident between July 7, 2001, and August 11, 2001, and the defendants shall pay said compensation. N.C. Gen. Stat. § 97-29.
3. The plaintiff is entitled to have defendants pay for all of her medical expenses incurred or to be incurred, as a result of her compensable injuries by accident, including treatment, surgery or evaluations for her back and right side pain and any other treatment, surgery, or evaluation recommended by Dr. McKibbin for so long as such evaluations, examinations and treatments may reasonably be requested to effect a cure, give relief and will tend to lessen plaintiff's disability. N.C. Gen. Stat. §§ 97-25; 97-2(19).
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commissioner enters the following:
 AWARD
1. Subject to a reasonable attorney's fee herein approved, the defendants shall pay to the plaintiff a compensation rate of $213.34 per week for temporary total disability benefits for her compensable injuries by accident of July 7, 2001, beginning August 12, 2001, and continuing, except for the dates plaintiff worked for J. Crew, and continuing until further Order of the Commission. Counsel shall also review the defendant's company records to determine whether plaintiff is owed any further disability compensation for the time periods plaintiff was out of work due to her injury by accident between July 7, 2001, and August 11, 2001, and the defendants shall pay said compensation.
2. Defendants shall pay for all of plaintiff's medical expenses incurred or to be incurred, as a result of her compensable injuries by accident, including treatment, surgery or evaluations for her back and right side pain and any other treatment, surgery, or evaluation recommended by Dr. McKibbin for so long as such evaluations, examinations and treatments may reasonably be requested to effect a cure, give relief and will tend to lessen plaintiff's disability.
3. A reasonable attorney's fee of twenty-five percent (25%) of the compensation benefits due the plaintiff under Paragraph 1 of this Award is approved for plaintiff's counsel and shall be deducted from those amounts and payable directly to plaintiff's counsel. Thereafter, every fourth compensation check shall be deducted from the sum due plaintiff and paid directly to plaintiff's counsel.
4. The defendants shall pay the costs.
This the __ day of ____________ 2005.
 S/_________________ PAMELA T. YOUNG COMMISSIONER
CONCURRING:
 S/_________________ THOMAS J. BOLCH COMMISSIONER
 S/_________________ CHRISTOPHER SCOTT COMMISSIONER